# DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| **RICHARD HOPKINS AND** | ) | |
| **JAMES HOPKINS,** | ) | |
| | ) | |
| **PLAINTIFFS** | ) | |
| | ) | **CIVIL NO. 1:13-CV-229-DBH** |
| **v.** | ) | |
| | ) | |
| **DAVID CLARONI,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO STRIKE

Calais police officer David Claroni has moved for partial summary judgment on the claims of two pro se plaintiffs, Richard and James Hopkins (the Hopkins Brothers, as they call themselves). They, in turn, have moved for summary judgment on some of their claims.[1] All the claims arise out of Officer Claroni's traffic stop of the Hopkins Brothers and their vehicle (Richard Hopkins was driving; James Hopkins was the passenger) in Calais, Maine, at around 6 p.m. on November 14, 2008. I **GRANT IN PART AND DENY IN PART** the defendant's motion for partial summary judgment ("Def.'s Mot.") (ECF No. 66). In doing so, I view the facts in the light most favorable to the Hopkins Brothers as the non-moving parties, and I also consider the 2010 Advisory Committee Note to Rule

---

[1] They styled their motion as a Motion for Judgment as a Matter of Law, but since evidentiary materials are involved, I have treated it as a Motion for Summary Judgment. (It is also premature as a motion for judgment as a matter of law because trial has not yet begun. See Fed. R. Civ. P. 50.)

56(e) that "[m]any courts take extra care with pro se litigants, advising them of the need to respond and the risk of losing by summary judgment if an adequate response is not filed.   And the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant."[2]   In that light, I **DENY** the defendant's motion to strike the plaintiffs' response in opposition to the motion for partial summary judgment (ECF No. 76).   I also **DENY** the plaintiffs' motion for summary judgment ("Pls.' Mot.") (ECF No. 80).

## FACTS[3]

Based upon a telephone call from off-duty sheriff's deputy Thomas Chambers, whom Officer Claroni knew, Claroni pulled over the Hopkins vehicle for running a stop sign.   The Hopkins Brothers both denied the traffic infraction. The succeeding interchange between Officer Claroni and the Hopkins Brothers became increasingly testy; Richard Hopkins refused to wind his window down sufficiently to the officer's satisfaction; Claroni claimed to smell alcohol coming

---

[2] Certainly the plaintiffs failed to comply with Local Rule 56, a not uncommon failing among non-lawyers.  But the summary judgment record here is unusually accessible as a result of testimony in a previous trial, see note 3 infra, and depositions in this case.

[3] The plaintiffs have furnished excerpts from what they say is a transcript of the Maine Superior Court (Washington County) criminal trial of James Hopkins, specifically testimony of Duane McLellan, Officer Claroni, and the Hopkins Brothers.   The transcript is not certified.   The defendant objects on the basis that Officer Claroni was not a party at the trial and that all the testimony at that trial is by definition inadmissible hearsay.   The defendant does not challenge the transcript's authenticity or lack of certification or the fairness of the excerpts.   I reject the hearsay challenge and the challenge based on Claroni not being a party.   (Claim and issue preclusion are not at stake.)   Trial testimony, like affidavits and deposition testimony, can be considered on a summary judgment motion.   "The controlling rule in this context is Fed. R. Civ. P. 56—which, as construed by the First Circuit, permits consideration of hearing testimony taken in other proceedings." Adams v. Rite Aid of Maine, Inc., No. 00-226-P-H, 2001 WL 320894, at *3 (D. Me. Mar. 5, 2001); Advance Fin. Corp. v. Isla Rica Sales, Inc., 747 F.2d 21, 27 (1st Cir. 1984) ("[T]here is no sensible rationale which would preclude reliance on sworn testimony faithfully recorded during the conduct of a judicially-supervised adversarial proceeding.").   I therefore rely upon admissible parts of the trial transcript, as submitted, in describing some of the facts in a light favorable to the plaintiffs.

from the vehicle; he wanted to ascertain whether the driver had been drinking (which the driver denied); the passenger asked for the officer's name and badge number and challenged Claroni's right to obtain the passenger's identification; at some point, Claroni reached through the driver-side window, which led to Richard Hopkins rolling the window up completely; the occupants of the vehicle took the gear shift out of park and revved the engine; Claroni threatened to break the driver's window with his baton if it was not wound down. Eventually, Claroni had Richard Hopkins exit the vehicle.

Richard Hopkins was escorted to Claroni's cruiser by Deputy Chambers, whom Claroni had earlier called for back-up. Claroni asked Duane McLellan, a firefighter whom he knew (McLellan had come from his home across the street to observe what was going on) to watch Richard Hopkins while Claroni and Chambers approached the Hopkins vehicle. Me. Superior Ct. (Washington Cnty.) Trial Proceedings Tr., Vol. II Excerpts ("Trial Tr."), pp. 174-80, Page ID #402-03 (ECF No. 70-2).[4] Claroni then got into the Hopkins vehicle on the driver's side— he says to remove the keys, but the Hopkins Brothers say to assault passenger James Hopkins—and a physical altercation ensued. In the truck during the altercation, Claroni saw a shotgun pointing toward the floor (it turned out to be unloaded and belonged to Richard, who had been hunting that day). At some point, Claroni sprayed mace on James Hopkins and James Hopkins exited the vehicle on his own, by force, or by some combination of the two. During the

---

[4] I use Page ID numbers when citing the transcript excerpts. Page ID numbers are a sequential pagination feature of the Electronic Case Filing system that gives a unique page number to every page of every document in a case based on the order in which the document is filed in the system.

altercation in the vehicle, Richard Hopkins was yelling at Claroni not to injure his brother, who has had six previous skull fractures.  Trial Tr., p. 21, Page ID #358.  McLellan, thinking Richard Hopkins was getting agitated to the point that he might intervene in the Claroni/James Hopkins altercation, moved to grab Richard Hopkins, and in the process tripped over his own untied shoelaces.  As a result, both he and Hopkins fell to the ground.   Other law enforcement personnel arrived on the scene at some point.

Claroni arrested both brothers, Richard for disorderly conduct and James for assault.  Law enforcement seized the shotgun and vehicle.  A blood alcohol test on Richard at the jail showed no alcohol.  Richard was released on bail and regained possession of his gun and vehicle that same evening.  Law enforcement took James to the hospital for treatment before he was returned to the jail. Richard bailed James the next morning.

On January 6, 2009, with Richard Hopkins present, a District Court judge in Calais made a finding of "no complaint" on the disorderly conduct charge, thus ending the case against Richard.  See State of Maine v. Richard Hopkins, No. CALDC-CR-2008-00492 (Calais, Maine).  James was tried for assault and, after a mistrial, entered a *nolo contendere* plea.  See State of Maine v. James Hopkins, No. MACSC-CR-2009-00006 (Machias, Maine).

### PROCEDURAL HISTORY

The Hopkins Brothers filed their pro se complaint in this court suing the Calais Police Department and a number of officers and individuals, asserting claims under 42 U.S.C. § 1983 for violation of their constitutional rights. Subsequently, they dismissed all defendants but Officer Claroni and Duane

McLellan.  I eventually granted McLellan's motion to dismiss because he was never properly served with process.  Order Granting Mot. to Dismiss (ECF No. 31).  Thus, the case now is proceeding against only Officer Claroni, and the only pertinent claims remaining in the complaint are seven counts against Claroni on behalf of Richard Hopkins[5] and seven counts on behalf of James Hopkins.[6] Claroni has moved for summary judgment on all but James Hopkins' excessive force claim.  The Hopkins Brothers have responded and claimed summary judgment in return.[7]

## ANALYSIS

### *(1)*   *False Arrest and First Amendment Claims (Counts 1 & 4—Both Plaintiffs)*

There are genuine issues of material fact on whether there was probable cause for Officer Claroni to arrest Richard Hopkins for disorderly conduct, and whether qualified immunity applies.  Officer Claroni says that he arrested Richard Hopkins "for disorderly conduct based upon his refusal to comply with Officer Claroni's requests and his physical altercation with Mr. McLellan."  Def.'s Mot. at 9.

With respect to "refusal to comply," it appears that Richard Hopkins did comply with all of Officer Claroni's requests, albeit slowly and after vociferous objection.[8]  With respect to the "physical altercation with Mr. McLellan," Officer

---

[5] Count 1, First Amendment; Count 2, Equal Protection; Count 3, Sixth Amendment; Count 4, Fourth Amendment re: arrest; Count 5, Fourth and Fourteenth Amendment re: search; Count 6, Second Amendment; Count 7, Due Process and Equal Protection.
[6] Count 1, First Amendment; Count 2, Equal Protection and Due Process; Count 3, Sixth Amendment; Count 4, Fourth Amendment re: arrest; Count 5, Fourth Amendment re: search; Count 6, Fourth Amendment re: excessive force; Count 7, Due Process and Equal Protection.
[7] See note 1 supra.
[8] "A person is guilty of disorderly conduct if . . . [i]n a public or private place, the person knowingly accosts, insults, taunts or challenges any person with offensive, derisive or annoying words, or

Claroni does not claim to have witnessed the "altercation,"[9] and McLellan testified at James Hopkins' criminal trial that he, McLellan, initiated the "altercation," not Richard Hopkins.  Specifically, during a hearing on a motion to suppress in the criminal trial, McLellan testified that he was with Richard Hopkins near Claroni's cruiser; that Richard Hopkins was becoming increasingly agitated over what was going on between Claroni and his brother to the point that McLellan "thought I better get to the upper hand before I don't have that action to be able to do so"; that McLellan "ended up trying to grab him," but that McLellan had not laced up his shoes, "and the second I went to grab him I had stepped on my other lacing and we both fell to the ground"; and that McLellan "wouldn't say I knocked him down.  He fell on me . . . . Once we hit the ground, he made some gestures to me, 'What are you doing, what are you doing?  I don't want to do this.'  And he got up, little bit of wrestling around to the point—but no punches . . . no anything like that was ever—was ever done."  Mot. to Suppress Hr'g Tr. (ECF No. 70-1), pp. 32-33, Page ID # 342-43.  McLellan testified to the same effect at the trial.  Trial Tr., pp.181-83, Page ID # 404.  This was also consistent with Richard Hopkins' trial testimony.  Id. at 203-06, Page ID # 409-10.

---

by gestures or other physical conduct, that would in fact have a direct tendency to cause a violent response by an ordinary person in the situation of the person so accosted, insulted, taunted or challenged . . . ."  17-A M.R.S.A. § 501-A(1)(B).  When the person(s) being accosted are police officers, "the conduct must be egregiously offensive, so offensive as to have a direct tendency to cause a violent response even from a police officer.  The word 'direct' contained in the statute refers to the necessity of finding a clear and present danger of an immediate breach of peace." State v. John W., 418 A.2d 1097, 1106 (Me. 1980).

[9] Defendant's Statement of Material Facts (ECF No. 67) ("Def.'s Facts"), at ¶ 55, and the Deposition of Richard Hopkins (ECF No. 68), p. 78, Page ID # 240, which the defendant cites, make no reference to what Officer Claroni observed or was told about the altercation.

It is a factual question, therefore, whether "there *clearly* was no probable cause at the time the arrest was made." Topp v. Wolkowski, 994 F.2d 45, 48 (1st Cir. 1993) (quoting Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985)) (emphasis in original). In the First Circuit, this inquiry covers both the question of whether there was probable cause and the question of whether Officer Claroni is entitled to qualified immunity for an unlawful arrest. See id.

On Richard Hopkins' First Amendment claim—that Officer Claroni unconstitutionally arrested him for his utterances about not hurting his brother—it is a factual question what motivated the arrest: the officer's unhappiness with Richard Hopkins' utterances or actual disorderly conduct. If Claroni had probable cause for the arrest, the First Amendment claim fails on account of qualified immunity, because the United States Supreme Court has held that a "First Amendment right to be free from a retaliatory arrest that is supported by probable cause" is not "clearly established." Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). But here there are disputed facts over the existence of probable cause, and thus at this stage the First Amendment claim remains. See, e.g., Patterson v. United States, 999 F. Supp. 2d 300, 310 (D.D.C. 2013) (stating that the D.C. Circuit has "expressly recognized that there is a First Amendment right not to be arrested in retaliation for one's speech where there is otherwise no probable cause for the arrest."); Tobey v. Jones, 706 F.3d 379, 392 (4th Cir. 2013) ("Reichle does not apply here because Mr. Tobey specifically alleges that his arrest was *not* supported by probable cause . . . .") (emphasis in original). In the absence of qualified immunity, the retaliatory arrest inquiry becomes whether a plaintiff can "show that the officer's intent or desire to curb

the expression was the *determining* or *motivating* factor in making the arrest, in the sense that the officer would not have made the arrest 'but for' that determining factor." <u>Tatro v. Kervin</u>, 41 F.3d 9, 18 (1st Cir. 1994) (emphasis in original).

As for James Hopkins, it is undisputed that there was a physical altercation between him and Officer Claroni.  But the criminal trial transcript reveals that there are genuine issues of material fact over who initiated the altercation and who was the aggressor, Claroni or Hopkins, and therefore whether Officer Claroni had probable cause to arrest James Hopkins for assaulting Claroni, or whether a reasonable police officer with the information available to Claroni would have known that he was violating a clearly established right.  However, the only apparent First Amendment violation that James Hopkins refers to is Officer Claroni telling him to "shut up" when James claimed that two officers were giving him conflicting directions about getting back into the truck.  Plaintiffs' Resp. in Opp'n to Def.'s Mot. for Summ. J. at 11, 26 ("Pls.' Opp'n") (ECF No. 70).  Officer Claroni's statement may have been rude, but it was not a First Amendment violation.

For these reasons, the defendant's motion is **GRANTED** as to the First Amendment claim of James Hopkins, but **DENIED** as to the First Amendment claim of Richard Hopkins and **DENIED** as to the unconstitutional arrest (lack of probable cause) claims of both.

### (2)   *Equal Protection (Counts 2 & 7—Both Plaintiffs)*

The Hopkins Brothers claim that Officer Claroni violated their Fourteenth Amendment right to equal protection of the laws.  But they do not claim to be

members of a protected class.  Instead, their claim seems to be two-fold—first, that it was arbitrary to arrest them without arresting Duane McLellan, Pls.' Opp'n at 10, 15; and second, that the truck's Florida license plate and Richard Hopkins' Florida driver's license generated the treatment they received.  Id. at 15.  I reject the proposition that a law enforcement officer's discretionary choice of whom to arrest, when it is not based on a suspect classification like race, is a violation of equal protection.  Moreover, the Hopkins Brothers have only speculation, not evidence, that Richard Hopkins' out-of-state plates or license arbitrarily affected the treatment they received.  See Martínez-Rodríguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) ("[S]ummary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.") (citation omitted).

I see no separate argument concerning these counts' references to the Hopkins Brothers' due process, safety, happiness, etc., and I **GRANT** the defendant's motion for summary judgment on Counts 2 and 7 in their entirety as to both plaintiffs.

### (3)    *Sixth Amendment (Count 3—Both Plaintiffs)*

The Hopkins Brothers have conceded that they have no viable Sixth Amendment claims.  Pls.' Opp'n at 14.  Therefore, the defendant's motion for summary judgment on that issue (Count 3 as to both plaintiffs) is **GRANTED**.

### (4)    *Basis for Traffic Stop and Search (Counts 4 and 5—Both Plaintiffs)*

The Hopkins Brothers challenge the initial traffic stop as an "unreasonable seizure." Pls.' Mot. at 5.  Both men have standing to challenge the stop.  Brendlin v. California, 551 U.S. 249, 258-59 (2007).  However, Officer Claroni did not

violate the Fourth Amendment when he stopped the Hopkins Brothers based on information from the deputy sheriff that their vehicle ran a stop sign.  Def.'s Mot. at 13; <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 819 (1996) ("[T]he officers had probable cause to believe that petitioners had violated the traffic code.  That rendered the stop reasonable under the Fourth Amendment . . . ."). The fact that Officer Claroni did not personally witness the plaintiffs' conduct is immaterial because police officers may form reasonable suspicion based on information provided to them by other officers.  <u>United States v. Brown</u>, 621 F.3d 48, 57 (1st Cir. 2010); <u>State v. Carr</u>, 1997 ME 221, ¶ 7, 704 A.2d 353 ("Reasonable and articulable suspicion to conduct an investigatory stop can rest on the collective knowledge of the police.").[10]  Therefore, the defendant's motion for summary judgment on that issue (Count 4 as to both plaintiffs) is **GRANTED**.

The Hopkins Brothers also appear to claim that two actions by Officer Claroni constituted unreasonable searches of the vehicle: (1) his reaching through the driver-side window; and (2) his entering the truck through the open driver-side door.  <u>See</u> Pls.' Opp'n at 30-31.  As a passenger without an ownership

---

[10] The fact that Officer Claroni was an officer with the City of Calais police department and Thomas Chambers was a Washington County Deputy Sheriff does not change the analysis.  <u>See</u> <u>United States v. Hensley</u>, 469 U.S. 221, 231 (1985) (concluding that a police officer can develop reasonable suspicion based on information from officers in a different police department).  Nor does the fact that Deputy Chambers was off-duty at the time of his communication to Officer Claroni change the analysis.  <u>See, e.g.</u>, <u>Drakeford v. Cnty. of Orange</u>, 213 Fed. App'x 542, 544 (9th Cir. 2006) (police can rely on tip from an off-duty police officer); <u>Pahle v. Colebrookdale Twp.</u>, 227 F. Supp. 2d 361, 370 (E.D. Pa. 2002) (same).  Some states by state law allow arrest for a misdemeanor only if the misdemeanor is committed in the presence of the officer.  <u>See</u> 3 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 5.1(c), at 34 (5th ed. 2012); 17-A M.R.S.A. § 15(1)(B).  However, the relevant question regarding the traffic stop is whether Officer Claroni had grounds for stopping the Hopkins vehicle, not whether he had grounds for arrest at the time of the stop.  Maine law explicitly allows an officer to stop a motor vehicle based on reasonable suspicion of a traffic infraction.  <u>See</u> 29-A M.R.S.A. § 105(1)(B).

interest in the vehicle, James Hopkins does not have standing to challenge the vehicle search.  See Rakas v. Illinois, 439 U.S. 128, 148 (1978); United States v. Tiru-Plaza, 766 F.3d 111, 116 fn. 9 (1st Cir. 2014).  Therefore, Officer Claroni's motion for summary judgment on that issue (Count 5) is **GRANTED** as to James Hopkins.

Both actions by Officer Claroni may be "searches" within the meaning of the Fourth Amendment.  The United States Supreme Court has said that "a car's interior as a whole is . . . subject to Fourth Amendment protection from unreasonable intrusions by the police," and that such an intrusion is a "search." New York v. Class, 475 U.S. 106, 114-15 (1986) (agreeing with the New York Court of Appeals), cited approvingly in United States v. Jones, 132 S. Ct. 945, 952 (2012).  On the other hand, the usual focus of Fourth Amendment concern is intrusions *to obtain information.*  (In Jones, the Court held that the attachment of a GPS device to a vehicle constituted a search because the "Government physically occupied private property *for the purpose of obtaining information.*") Jones, 132 S. Ct. at 949 (emphasis added).  Information was not the purpose of Claroni's intrusions.

But without deciding whether either of the challenged actions constituted a search, I find that Officer Claroni is entitled to qualified immunity on Richard Hopkins' claim because Claroni did not violate any "clearly established" right.[11] A right is "clearly established" when "every reasonable official would have

---

[11] "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."  Reichle, 132 S. Ct. at 2093 (citing Pearson v. Callahan, 555 U.S. 223, 227 (2009)).

understood that what he is doing violates that right" and "existing precedent [has] placed the statutory or constitutional question beyond debate." Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2083 (2011) (internal quotation and citations omitted).

An officer may take reasonable actions during a traffic stop to ensure officer safety and further the investigation.  See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (requiring drivers to exit their vehicles during stops is a "*de minimis*" intrusion justified by "legitimate concerns for the officer's safety."); New York v. Class, 475 U.S. at 117-19 (officer acted reasonably by reaching into car to clear papers from dashboard that could have been covering the Vehicle Identification Number); United States v. Ryles, 988 F.2d 13, 15 (5th Cir. 1993) (officer did not act unreasonably by either "placing his head inside the interior of the van through an open window or in opening the driver's door and placing his torso inside."); United States v. Stanfield, 109 F.3d 976, 983 (4th Cir. 1997) (officer's opening of passenger door to see if passenger was armed is intrusion no more significant than asking the passenger to exit the vehicle).  The First Circuit has held that officers did not run afoul of the Fourth Amendment when they opened a front passenger door to see the passenger's hands because the intrusion was "minimal" and was based on "reasonable suspicion [that] criminal activity was afoot."  United States v. Ramos, 629 F.3d 60, 64-68 (1st Cir. 2010). In addition, an officer's reasonable actions during a traffic stop may include securing the vehicle.  See United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004) ("It is also well settled that a police officer executing such a stop may exercise reasonable superintendence over the car and its passengers."); United

States v. Molina, No. 06-653, 2007 WL 2850592, at *2 (E.D. Pa. Oct. 2, 2007) (officer was justified in reaching into car to turn off ignition after driver failed to comply with officer's requests to shut engine off).

Based on this case law, a reasonable officer in Officer Claroni's position could conclude that it did not violate any clearly established right to attempt to open the driver-side door by inserting the officer's arm through the open window in order to effect the driver's exit from the vehicle, or to enter the vehicle to turn off the engine and secure the keys. (It is undisputed that the truck was running and that the occupants had previously taken the gear shift out of park and revved the engine. See Def.'s Facts ¶ 32; Pls.' Resp. to Def.'s Statement of Material Facts ¶ 32 ("Pls.' Facts") (ECF No. 78).) The Hopkins Brothers dispute Officer Claroni's actual motives in reaching through the window and entering the vehicle. But Whren makes clear that an officer's actual motives do not determine the reasonableness of the conduct for Fourth Amendment purposes. Instead, the inquiry is whether the behavior is "objectively justifiable." Whren, 517 U.S. at 812. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." Id. at 814 (emphasis in original); see United States v. McGregor, 650 F.3d 813, 821-22 (1st Cir. 2011) (Whren's holding casts doubt on previous First Circuit law that allowed consideration of an officer's motivations in the context of a weapons search). For these reasons, the defendant's motion for summary judgment as to the unreasonable search claim (Count 5 for Richard Hopkins) is **GRANTED** on the basis of qualified immunity.

**(5)**     ***Excessive Force (Count 6—James Hopkins)***

Officer Claroni does not seek summary judgment as to James Hopkins' claim of excessive force.  Claroni maintains that he will prevail on this issue at trial, but he recognizes that there are factual disputes.  Therefore, I will not address that issue further.

There is no count in the complaint claiming that Officer Claroni used excessive force with respect to Richard Hopkins.  Cases saying that force, when used, does not have to be significant to be unconstitutional, Pls.' Opp'n at 32, are therefore not pertinent.  There simply is no claim of force with respect to Richard Hopkins.

**(6)**     ***Second Amendment Claim (Count 6—Richard Hopkins)***

Richard Hopkins claims that his Second Amendment rights were violated when "Officer Claroni took [his] gun."  Pls.' Mot. at 3.  There is no dispute that the gun was returned to Richard Hopkins when he was released from custody later on the evening of his arrest.  See Def.'s Facts ¶ 69; Pls.' Facts ¶ 69.

Given the arrest of the gun's owner here, public safety required the temporary seizure of the weapon.  See Cady v. Dombrowski, 413 U.S. 433, 441 (1973) (holding warrantless seizure of vehicle, and gun inside vehicle, was justified by police "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.").

Moreover, the Second Amendment is not implicated by the seizure.  The First Circuit recently declined to extend the right to keep and bear arms beyond "defense of hearth and home."  See Powell v. Tompkins, 2015 WL 1681274, 783

14

F.3d 332, at *12 (1st Cir. Apr. 15, 2015).  Courts have also generally held that the Second Amendment is not implicated by the seizure of individual firearms. See, e.g., Walters v. Wolf, 660 F.3d 307, 318 (8th Cir. 2011) ("On this record, however, we hold that Walters has not established that the City and Chief Wolf have violated his Second Amendment right to keep and bear arms.  The defendants' policy and action affected *one* of Walters's firearms, which was lawfully seized.  The defendants did not prohibit Walters from retaining or acquiring other firearms.") (emphasis in original); Tirado v. Cruz, No. CIV. 10-2248 CVR, 2012 WL 525450, at *6 (D.P.R. Feb. 16, 2012) (citing Walters v. Wolf approvingly); Bane v. City of Philadelphia, No. CIV.A. 09-2798, 2009 WL 6614992, at *10 (E.D. Pa. June 18, 2009) ("No government official is barring Plaintiff from obtaining a firearm and none is preventing Plaintiff from availing himself of the procedure for the return of his firearm.  Moreover, no law has been cited that infringes upon Plaintiff's right to obtain a firearm.  The Second Amendment does not bar police from seizing the items taken in this case.").

Based on the undisputed facts in the record, I conclude that Richard Hopkins does not have a viable Second Amendment claim based on the seizure of his gun while he was in police custody.  This analysis would not change even if his arrest was unlawful, because of the First Circuit decision in Powell v. Tompkins and because there is no Second Amendment issue presented by the seizure of a particular firearm.  The defendant's motion for summary judgment as to the Second Amendment claim (Count 6 for Richard Hopkins) is **GRANTED**.

## CONCLUSION

What claims remain for trial in this lawsuit are the following:  Richard Hopkins' claim of unconstitutional arrest based upon an asserted lack of probable cause and retaliation in violation of the First Amendment (his Counts 1 and 4); James Hopkins' claim of unconstitutional arrest (his Count 4); and James Hopkins' claim of excessive force (his Count 6).

SO ORDERED.

DATED THIS 18TH DAY OF MAY, 2015

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

16

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE (BANGOR)**
**CIVIL DOCKET NO. 1:13-CV-229-DBH**

| | | |
|---|---|---|
| **Richard Hopkins** | Represented By | Richard Hopkins, Pro Se |
| | | James Hopkins, Pro Se |
| **and** | | 105 Damon Ridge Road |
| | | Charlotte, ME  04666 |
| **James Hopkins** | | |
| | | |
| **v.** | | |
| | | |
| **David Claroni,** *Officer* | Represented By | **John J. Wall, III** |
| | | Monaghan Leahy, LLP |
| | | P.O. Box 7046 |
| | | Portland, ME  04112-7046 |
| | | (207) 774-3906 |
| | | email: jwall@monaghanleahy.com |

17